**Kristin FOOTE, Plaintiff,**

v.

**Roger SPIEGEL, Robert Howe, Eric McPherson, and Jeffrey L. Graviet, Defendants.**

**No. 94–C–754W.**

United States District Court,
D. Utah,
Central Division.

Oct. 23, 1995.

W. Andrew McCullough, Randy M. Lish, McCullough, Jones & Ivins, Orem, UT, and Jensie L. Anderson, American Civil Liberties Union, Salt Lake City, UT, for Plaintiff.

Rebecca D. Waldron and Dan R. Larson, Utah Attorney General's Office, Salt Lake City, UT, for Defendants.

MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

WINDER, Chief Judge.

## I. INTRODUCTION

This matter is before the court on three separate motions for summary judgment: (1) plaintiff Kristin Foote's ("Foote" or "Plaintiff") motion for partial summary judgment against defendant Roger Spiegel ("Trooper Spiegel"), (2) Trooper Spiegel's cross motion

for partial summary judgment, and (3) Robert Howe ("Trooper Howe"), Eric McPherson ("Trooper McPherson"), Jeffrey L. Graviet ("Trooper Graviet"), and Trooper Spiegel's (collectively "Defendants") motion for summary judgment as to all remaining claims. A hearing on this motion was held October 3, 1995. Plaintiff was represented by W. Andrew McCullough and Jensie L. Anderson. Defendants were represented by Rebecca D. Waldron and Dan R. Larsen. At the hearing, the court also set for review *sua sponte* Plaintiff's first motion for partial summary judgment, which had previously been denied.[1] *See* Memorandum Decision and Order Denying Plaintiff's Motion for Partial Summary Judgment, Case No. 94–C–754W (July 7, 1995). Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. The court also viewed the videotape of the traffic stop at issue. Since taking the matter under advisement, the court has further considered the law and facts relating to the various motions, and again viewed the videotape. Now being fully advised, the court enters the following memorandum decision and order.

## II. *BACKGROUND*

This action is based on a traffic stop which occurred on State Route 89 ("Route 89") in Davis County, Utah at approximately 1:20 p.m. on Sunday, May 8, 1994. There is no minimum speed limit on Route 89. In addition, where the instant events occurred on Route 89, there is a center turn lane.[2] *See* Videotape.

At the time of the incident Plaintiff was driving a GEO Metro ("GEO") and was traveling north in the left lane of Route 89. The GEO did not have a front or rear license plate, but did have a temporary registration permit ("temporary permit") affixed to the back side window on the driver's side, facing outward. Plaintiff's male friend, who had very long hair and tattooed arms and who was wearing a tank top, was seated in the passenger seat. Her four-year-old daughter was in the back seat.[3] Trooper Howe was traveling in his patrol vehicle in the right northbound lane of Route 89.

Trooper Howe first observed the GEO "coming up behind him in the left lane," and noticed in his rear view mirror that it did not have a front license plate. Believing that there might be registration problems with the vehicle, he slowed down to get behind it. As he came alongside the GEO on the passenger side, Trooper Howe states that he looked at the vehicle and observed a handwritten mirror-image expiration date through the back of the temporary permit.[4] He further states that he thought that the expiration date "looked as if it could have been altered. The '1' in the '17' appeared larger and darker than the other numbers." *See* Affidavit of Robert Howe at ¶ 8 (undated) (mailing certificate executed May 19, 1995) [hereinafter First Howe Aff.]; *see also* Howe Depo. at p. 44 ("One number was darker than the other numbers."); Videotape (informing Plaintiff that the "1" in the "17" appeared smaller than the other numbers). Trooper Howe later stated that "the black marker used to write the expiration date [had] bled through to the back of the plate, and the sun was shining on the front of the plate." Supplemental Affidavit of Robert Howe at ¶ 2 (Aug. 18, 1995).

Trooper Howe then pulled in behind the GEO and immediately "turned on the video camera that [was] attached to the dash of his police vehicle." *See* Memorandum in Support of Defendants' Motion for Summary Judgment at p. 4 (Aug. 18, 1995) [hereinafter Defendants' Memo.]. As the videotape begins, the GEO is seen approaching an area with a northbound left-turn lane and what

---

1. The parties were ordered to submit additional memoranda dealing with *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994), as it relates to the stop and to qualified immunity. These were timely submitted and have been carefully reviewed by the court.

2. On the videotape, vehicles can be seen using this turn lane.

3. It is unclear where and how the child was positioned in the back seat.

4. At the time in question, temporary permits were made of lightweight paper, and the expiration date was handwritten thereon in marker or pen.

appear to be overhead traffic signals.[5] A second vehicle can be seen stopped in this turn lane. *See* Videotape. Shortly thereafter, at 13:18:33,[6] Trooper Howe reported that he was activating his overhead lights in order to pull the GEO over. At 13:18:37, Trooper Howe commented that he was "not getting any response out of her." Also at 13:18:37, the GEO's right directional signal went on. The GEO waited to merge into the steady traffic in the right lane, then pulled over into the emergency lane and stopped. The GEO was in the emergency lane by 13:18:56. *See id.* "From the point that [Trooper Howe] first observed the [GEO] to the point that [it] stopped ... was approximately a mile." Howe Depo. at p. 47. According to Trooper Howe, his reason for stopping Plaintiff was "to see if her vehicle's registration had expired because her temporary plate[ ] appeared to have been altered." First Howe Aff. at ¶ 12; *see also* DUI Report Form (stating Plaintiff "was stopped for an equipment violation").

Exiting his vehicle, Trooper Howe first walked up to the left rear of the GEO, then hesitated momentarily before turning to the right and approaching the passenger side. *See* Videotape. He did not inspect the temporary permit at this time,[7] and states that he approached first from the passenger side for his safety, mentioning that he did not want to divide his attention between the traffic on Route 89 and the GEO's occupants. First Howe Aff. at ¶ 13. At the passenger side window, Trooper Howe leaned over and asked Plaintiff for a driver's license. He then asked the passenger for identification. He also asked the passenger why he was not wearing a seat belt. After exchanging a few words with the passenger, Trooper Howe walked to the back driver's side of the GEO—still holding Plaintiff's driver's license. At the GEO's left rear, while standing behind the vehicle and completely off the roadway, he leaned to the side and briefly looked at

the temporary permit affixed to the side window. *See* Videotape.

Trooper Howe then approached the driver's side window, and informed Plaintiff that:

[t]he reason why I stopped you is just on the other side of your car your line [sic] in your "17" here kinda looks smaller like maybe you put it on there, it doesn't, just looking at it here.

*See* Videotape Transcript (attached as exhibit to Additional Memorandum in Support of Plaintiff's First Motion for Partial Summary Judgment (Oct. 10, 1995)); *see also* Videotape.

Without returning the driver's license, Trooper Howe then continued:

Another thing you were in the left lane and you start going 40 miles an hour, it starts causing problems you know what I mean, I mean traffic was piled up behind us.

*Id.*

Plaintiff responded:

My car doesn't go up hill very well.

*Id.*

At this point, based on Plaintiff's "slowness" during this brief verbal exchange, on her allegedly bloodshot eyes, and "in thinking back to her driving pattern,"[8] Trooper Howe immediately asked Plaintiff to get out of the GEO and move to the back of the vehicle. First Howe Aff. at ¶ 17. There, he asked what was wrong with her eyes and she told him that she had lost her glasses. *See* Videotape. Trooper Howe then administered the Horizontal Gaze Nystagmus test ("HGN"), a test in which he was not formally trained, which Plaintiff passed. He also administered a convergence test, in which he was not formally trained, and determined that there was a lack of convergence. First Howe Aff. at ¶ 21. Based on these tests, on the "greenish" tint to Plaintiff's tongue, her alleged "driving pattern," and her alleged "slowness," Trooper Howe decided that she was impaired by marijuana. *Id.* He then

---

5. It is unclear how these signals operate or which traffic lanes are affected.

6. All times used herein are the times indicated on the videotape clock. Trooper Howe's verbal commentary can also be heard on the videotape.

7. Plaintiff disputes this.

8. Trooper Howe alleges that Plaintiff was weaving in her lane, crossing over the yellow line, and driving too slow.

radioed for assistance from Trooper Spiegel, a certified drug recognition expert ("DRE"). During the wait for Trooper Spiegel, Plaintiff did not approach the GEO, and apparently conversed with Trooper Howe. *See* Videotape.

Trooper Spiegel arrived on the scene [9] and administered a roadside sobriety test battery [10] to Plaintiff. At the conclusion of these screening tests, and based on the totality of his observations, Trooper Spiegel arrested Plaintiff for driving under the influence of marijuana ("DUI"). Plaintiff was immediately handcuffed and was apparently placed in the patrol vehicle. [11]

Plaintiff's passenger, who had been waiting in the GEO, was ordered out of the vehicle and told to place his hands on his head. Trooper Howe then performed a patdown search, and the passenger was told to empty his pockets. *Id.* Trooper Howe found no contraband or weapons.

Shortly thereafter, Trooper McPherson arrived to assist in the search of the GEO, which Trooper Howe and Trooper Spiegel had already begun. Among other things, the troopers looked inside paper sacks and the glove compartment, and also removed and searched a duffel bag and what appear to be plastic grocery bags located in the hatchback portion of the GEO. *See id.* Clothing and other items were taken out of the duffel bag and searched thoroughly. *Id.* After a complete search in which no weapons or contraband of any type were found, the GEO was impounded. Trooper McPherson also assisted the passenger and Plaintiff's child in obtaining transportation home.

Plaintiff, accompanied by Trooper Spiegel, was transported to the Davis County Jail ("Jail"). She was searched upon arrival by Catherine Williams ("Williams"), an employee assigned to the intake area. *See* Williams Depo. at p. 9. Plaintiff was wearing light clothing—sandals without socks, shorts that stopped a few inches above the knee, and a T-shirt. *See* Videotape. The search included an examination of external clothing, "feeling" in the pelvic area, and a search of the hair, ears, mouth, and feet. Williams found no weapons or contraband. Williams' descriptions of Plaintiff's behavior at the Jail are not completely consistent, but do include comments that she was loud, flippant, argumentative, and slow. Her essential story, however, is that Plaintiff was very angry at Trooper Spiegel and was also indignant, but "was not hostile or aggressive at all with me." *See* Williams Depo. at pp. 16–17. Williams also thought that Plaintiff might be "under the influence." She also believed that Plaintiff "felt unfaired against." *Id.* at p. 17.

At the Jail, Trooper Spiegel conducted breathalyzer, blood pressure, and pulse tests, all of which proved either negative or normal. Plaintiff was also given a urine test. In addition, Trooper Spiegel had Williams accompany him into a bathroom where he ran light tests and pupil dilation tests on Plaintiff.

After the breathalyzer test showed a blood alcohol reading of .00%, Trooper Spiegel told Williams to conduct a strip search of Plaintiff. *Id.* at p. 25. It was Williams' impression that Trooper Spiegel thought Plaintiff had drugs on her, although he never told her what Plaintiff had been charged with. *Id.* at pp. 25, 46.

The strip search was conducted in the bathroom. During the search, Plaintiff was very uncomfortable and reluctant about revealing the lower part of her body. *Id.* at p. 31. She was not combative, however, and instead appeared to be "trying to protect [Williams]." *Id.* at p. 32. Once again, no contraband was found.

9. Plaintiff contends that Trooper Spiegel did not conduct a proper interview of Trooper Howe before beginning the tests. It appears that Trooper Spiegel arrived at the scene by at least 13:43:22 and approached Foote to begin the tests at about 13:44:33. There is no audio during this portion of the videotape, and the two troopers cannot be seen.

10. The tests consisted of the HGN and convergence tests, the Romberg balance test (including a time estimation exercise), the Walk and Turn test, the One-Leg Stand test, and the Finger to Nose test.

11. The parties have not indicated whether Plaintiff was searched at the scene.

Plaintiff was assisted in contacting someone to help her obtain her release. It is undisputed that she posted bond quickly and that she was never placed in the general inmate population. It is further undisputed that Plaintiff's urine tested negative for drugs, and that the charges against her were dropped.

On August 1, 1994, Plaintiff filed the complaint in this action, stating the following claims: (1) violation of Plaintiff's right of privacy and Fourth, Fifth, and Fourteenth Amendment rights, actionable under 42 U.S.C. § 1983 (against all Defendants), (2) false arrest (Howe, Spiegel), (3) unreasonable detention (Howe, Spiegel, McPherson), (4) illegal search (Howe, Speigel, McPherson), and (5) failure to supervise (Graviet). *See* Amended Complaint, Case No. 94–C–754W (Jan. 30, 1995).

In support of her two motions for partial summary judgment as to liability only, Plaintiff asserts the following: (1) the stop was pretextual, (2) Trooper Howe's actions in detaining her after the stop were either without legal authority or outside the scope of detention, and (3) the strip search ordered by Trooper Spiegel was illegal. Defendants make the following basic arguments in support of their two motions: (1) the strip search was not illegal, (2) there were no other constitutional violations, (3) the state law claims are barred for failure to file a claim and on the basis of immunity, and (4) Defendants are entitled to qualified immunity.

### III. *STANDARD OF REVIEW*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom

in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991).[12] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.), *cert. denied*, 502 U.S. 827, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[13] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

### IV. *DISCUSSION*

#### A. *Trooper Howe*

■ The Fourth Amendment offers protection against unreasonable searches and seizures. To determine the "limits of police conduct in the context of routine traffic stops, [the Tenth Circuit employs] the analysis used by the Supreme Court in *Terry v. Ohio*, 392

---

**12.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.

**13.** "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.

U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for investigative detentions." *United States v. Dewitt,* 946 F.2d 1497, 1501 (10th Cir. 1991), *cert. denied sub nom. Rison v. United States,* 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). This entails a two-pronged analysis: " '[1] whether the officer's action was justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).

### 1. Pretext Stop

Focusing on the first prong of this analysis, Plaintiff first contends that Trooper Howe's action in stopping her vehicle was an unconstitutional pretext stop. She asserts that Trooper Howe's reason for the stop was not to determine the validity of the temporary permit, but instead was because his interest had been piqued by her passenger's unusual appearance. Defendants counter that: (1) the stop was not pretextual, and (2) Trooper Howe is entitled to qualified immunity because the law regarding pretext stops was not well-established at the time of the stop.

*a. Standard of Review for Qualified Immunity*

■ It is well-settled that "[a] public officer will only be held liable for his conduct if it can be shown that he [1] trenched upon a plaintiff's clearly established constitutional or statutory right and [2] if a reasonable person in the defendant officer's position would have known his conduct violated that right." *Beard v. City of Northglenn, Colo.,* 24 F.3d 110, 114 (10th Cir.1994) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Once a qualified immunity defense has been raised, "the plaintiff then has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right." *Walter v. Morton,* 33 F.3d 1240, 1242 (10th Cir.1994) (citing *Woodward v. City of Worland,* 977 F.2d 1392, 1396 (10th Cir.1992), *cert. denied sub nom. Woodard v. Seghetti,* —— U.S. ——, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993)). In order to meet this burden:

the plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it. Rather, the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity, and "demonstrate a 'substantial correspondence between the conduct in question and prior law ... establishing that the defendant's actions were clearly prohibited.' Unless such a showing is made, the defendant prevails."

*Romero v. Fay,* 45 F.3d 1472, 1475 (10th Cir.1995) (internal citations omitted). "Once the plaintiff has sufficiently alleged the conduct violated clearly established law, then the defendant bears the burden, as a movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Walter,* 33 F.3d at 1242. When genuine and material factual disputes exist, summary judgment is inappropriate. *See Cottrell v. Kaysville City, Utah,* 994 F.2d 730, 733–34 (10th Cir.1993) (per curium). Furthermore, in reviewing a motion for summary judgment based on qualified immunity, "[the trial] court does not make credibility findings." *Walter,* 33 F.3d at 1244.

*b. Clearly Established Law*

■ In *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988), the Tenth Circuit adopted the pretext stop doctrine. The court defined these stops as ones in which:

the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example ... occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity.

*Id.* at 1515. Defining the contours of the doctrine, the court noted that an objective test must be used to determine whether a stop is pretextual: "a court should ask 'not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have

made the stop in the absence of the invalid purpose.'" *Id.* at 1517 (quoting *United States v. Smith,* 799 F.2d 704, 709 (11th Cir.1986)).

Defendants now contend that the law regarding pretext stops is in transition and is not well-established. As evidence, they point to *Guzman* and also to *State v. Lopez,* 873 P.2d 1127 (Utah 1994), in which the Utah Supreme Court rejected the pretext stop doctrine. *See Lopez,* 873 P.2d at 1140.

Although the conflict between these two cases is obvious, this court is nevertheless bound to apply the law as articulated by the Tenth Circuit. Accordingly, the court finds that the applicable law was clearly established on May 8, 1994.

#### c. *Violation of Constitutional Rights*

This issue therefore turns on whether Plaintiff has sustained her burden of "demonstrating how defendants' conduct violated clearly established law." *See Rozek v. Topolnicki,* 865 F.2d 1154, 1157 (10th Cir.1989). Moreover, material facts must not be in dispute.

■ It is the court's opinion that this issue is replete with disputed issues of material fact which preclude summary judgment. These disputed facts generally revolve around the temporary permit's visibility. For example, Defendants have provided affidavits intended to show that reasonable officers make stops based on their suspicions as to potentially altered temporary permits. *See* Affidavit of Eric McPherson at ¶¶ 6–7 (Aug. 18, 1995); Supplemental Affidavit of Roger Spiegel at ¶¶ 3–4 (undated). However, these affidavits do not address the specific circumstances involved in this case. Indeed, neither affidavit explicitly states that these troopers have made stops based on viewing mirror-image, handwritten numbers from a moving vehicle. In addition, both affidavits state that handwritten numbers are easily read, "especially when the sun is shining on the front of the plate." However, this stop occurred at approximately 1:20 p.m., and Plaintiff disputes that the sun was shining on the front of this particular "plate."

Furthermore, the exhibits provided by Defendants do little to clarify these disputed issues. *See* Attachments 1 & 2 (attached to Defendants' Court Ordered Memorandum in Support of Their Motion for Summary Judgment (Oct. 10, 1995) [hereinafter Defendants' Supp.Mem.] ). First, the vehicle Defendants have used to display the temporary permit is not a GEO Metro. Second, despite the photographs provided, there remains a genuine dispute as to whether the handwritten portion of the permit is "easy to read" in mirror-image. *See* Attachment 2.

When these issues are combined with the fact that a child was in the back seat of the GEO, and that the vehicles were traveling at highway speed, there are indeed disputed material issues of fact. Accordingly, both parties' motions for summary judgment are denied as to this issue.

#### 2. *Illegal Detention*

Plaintiff also alleges that her continued detention after Trooper Howe verified the validity of the temporary permit violated clearly established law. Defendants dispute this, arguing that: (1) under *United States v. McSwain,* 29 F.3d 558 (10th Cir.1994), further detention was reasonable, and (2) qualified immunity is appropriate because the applicable law was not clearly established.

#### a. *Clearly Established Law*

■ Defendants do not argue that the law regarding illegal detentions was not clearly established. Instead, they contend only that prior to *McSwain*—which was handed down two months after the instant events—officers could request a driver's license, registration, and run a computer check upon making a "valid traffic stop." *See* Defendants' Supp. Mem. at p. 3. This argument, however, fails to take into account the interplay of the "scope of detention" and "requesting identification" issues. It also ignores *McSwain*'s clear message.

In *McSwain,* a police officer made a traffic stop on June 9, 1993 because he was unable to read the expiration date on the temporary sticker located on McSwain's vehicle. *McSwain,* 29 F.3d at 560. The officer's sole reason for stopping McSwain was to "verify the validity of the temporary sticker." *Id.* He immediately did so, but nevertheless

asked McSwain for identification and vehicle registration and also engaged him in conversation unrelated to the reason for the initial stop. *Id.* After running computer checks on the identification, the officer asked if he could search the vehicle. McSwain agreed, and in the course of the search the officer found cocaine in a duffel bag located in the trunk. *Id.* McSwain argued before the trial court that this evidence should be suppressed because it "was the fruit of an unlawful detention." *Id.* The trial court denied this motion. *Id.* at 559. On appeal, the Tenth Circuit reversed, holding that "[the officer's] further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification." *Id.* at 561. In so doing, the court rejected the government's argument that "Tenth Circuit precedent entitles [an officer] to engage in such 'minimally intrusive' conduct [as requesting a driver's license and asking additional questions about the vehicle or travel itinerary]." *Id.* The court pointed out that:

> [t]hough we have held in several cases that an officer conducting a routine traffic stop may inquire about "identity and travel plans," and may "request a driver's license and vehicle registration, run a computer check, and issue a citation," these cases—cited by the government—are inapposite. They all involve situations in which the officer, at the time he or she asks questions or requests the driver's license and registration, still has some "objectively reasonable articulable suspicion" that a traffic violation "has occurred or is occurring." Such cases stand in sharp contrast to the facts of the instant case: [the officer's] reasonable suspicion regarding the validity of Mr. McSwain's temporary registration sticker was completely dispelled *prior* to the time he questioned Mr. McSwain and requested documentation. Having no "objectively reasonable articulable suspicion that illegal activity ha[d] occurred or [was] occurring," [the officer's] actions in questioning Mr. McSwain and requesting his license and registration exceeded the limits of a lawful investigative

detention and violated the Fourth Amendment.

*Id.* at 561–62 (internal citations omitted) (omitted citations note such "ongoing" violations as speeding, tailgating, and expired license plate). Thus, the *McSwain* court recognized that in at least June of 1993 such actions exceeded the scope of detention and were unconstitutional.

In the court's opinion, *McSwain*'s holding was not a departure from prior established law. Indeed, the analytical approach employed in *McSwain* is consistent with that endorsed by the United States Supreme Court:

> [t]he contours of the [clearly established] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (internal citation omitted). In short, the *McSwain* analysis is simply illustrative of a situation where "in the light of pre-existing law" a particular "unlawfulness [was] apparent."

### b. *Violation of Constitutional Rights*

■ It is well established that detention after an investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1878. Indeed, "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *accord, United States v. Walker,* 933 F.2d 812, 816 (10th Cir.1991), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (noting that unreasonable seizure occurred because "the detention was not reasonably related in scope to the circumstances that justified the interference in the first place"). Stated succinctly:

an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, *the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.* It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Royer,* 460 U.S. at 500, 103 S.Ct. at 1325 (emphasis added) (internal citations omitted). This does not mean that the court should indulge in abstract speculation in an effort to find potentially "less intrusive" investigative methods. *See United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985). Instead, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Id.* at 687, 105 S.Ct. at 1576. Furthermore, even when a traffic stop is valid and a citation has been issued and computer checks have been run on registration and driver's license, further questioning is permissible in only two circumstances:

> First, the officer may detain the driver for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. Second, further questioning is permissible if the initial detention has become a consensual encounter.[14]

*United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994) (internal citations omitted).

The facts of this case are analogous to those in *McSwain.* The sole material difference is that in *McSwain* the officer first verified the validity of the permit before requesting the driver's license and engaging the driver in further conversation. This dif-

ference, however, cannot be used to justify Trooper Howe's actions.

■ It is undisputed that Trooper Howe stopped Plaintiff for the sole purpose of verifying the validity of the temporary permit. *See* First Howe Aff. at ¶ 12; DUI Report Form. Apparently mindful of the limited nature of this purpose, Defendants now attempt to meet their burden to show that this seizure was "sufficiently limited in scope and duration" by pointing to Trooper Howe's "safety concerns." However, under the facts of this case, Trooper Howe's failure to check the temporary permit before requesting Plaintiff's driver's license was unreasonable.

"[T]he investigative methods employed [to investigate the purpose of the investigative stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. Here, the videotape shows clearly that Trooper Howe acted unreasonably in failing to "recognize and pursue" the least intrusive means available to dispel his suspicions. *See Sharpe,* 470 U.S. at 687, 105 S.Ct. at 1576. Trooper Howe could have—and should have—checked the temporary permit before approaching Plaintiff and her passenger and requesting the driver's license and identification. It is obvious that doing so would have posed no safety risk to Trooper Howe, since he later checked the permit while standing clear of the roadway and by simply leaning over to examine it. *See* Videotape. This could easily—and more logically—have been done on Trooper Howe's initial approach to the GEO.

This court is mindful of the absence of practical alternatives to stopping a vehicle in order to verify a suspicious temporary permit. Nevertheless, to sanction Trooper Howe's failure to use the least intrusive means to dispel his suspicions—and to accept without question his reasons for that failure—would encourage circumvention of the "scope of detention" doctrine in similar limited detention situations.

---

14. There is no argument that the encounter in this case had become consensual. Indeed, it could not have because Trooper Howe retained Plaintiff's driver's license at all times. *See United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993).

Furthermore, there is no merit to Defendants' argument that the detention was reasonable under *McSwain* because Trooper Howe was simply explaining the reason for the stop. In *McSwain*, the court recognized that "[a]s a matter of courtesy, the officer could explain to drivers in Mr. McSwain's circumstances the *reason for the initial detention* and then allow them to continue on their way." *Id.* at 562 (emphasis added). In this case, however, Trooper Howe's "explanation" went beyond the reason for the initial detention. With Plaintiff's driver's license still in hand, he also commented on Plaintiff's driving pattern—which was not the reason for the initial detention. Trooper Howe then used the one-sentence response elicited by that comment to justify expanding the scope of detention. In short, Trooper Howe's conversation went beyond a perfunctory "courtesy comment."[15]

Accordingly, the court finds that this detention "exceeded the scope of the stop's underlying justification," and that there was no reason for Trooper Howe to either request Plaintiff's driver's license or to engage her in unnecessary conversation. Consequently, the search conducted by Trooper Howe thereafter was also without legal justification.

### B. Trooper Spiegel

#### 1. False Arrest

Defendants argue that Trooper Spiegel had probable cause to arrest Plaintiff for driving under the influence and that he is therefore entitled to qualified immunity. In opposition, Plaintiff argues only that this issue is extremely fact-intensive, and that it is inconceivable "that a jury of rational people could support the officers in their contention that there was probable cause for the arrest." Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at p. 23 (Sept. 5, 1995) [hereinafter Plaintiff's SJ Response]. In particular, Plaintiff alleges that a person of reasonable intelligence could tell that Plaintiff is "a little slow of speech" due to physical reasons, and also "that a person of reasonable intelligence might look for reasons other than being under the influence of drugs" to explain this slow speech pattern. *See id.*

The court finds Plaintiff's argument without merit. As Defendants point out, the issue is not whether Plaintiff was actually under the influence of a controlled substance, but whether Trooper Spiegel had probable cause to believe that she was.

 The constitutionality of a warrantless arrest is analyzed under a probable cause standard. *Romero*, 45 F.3d at 1476 (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964)). Regarding this issue, the United States Supreme Court has instructed that:

[p]robable cause to arrest depends "upon whether, at the moment the arrest was

---

**15.** Even if this had been a less limited stop, it is the court's opinion that expanding the scope of detention would not have been justified. Indeed, the reasons given by Trooper Howe for doing so are insufficient to establish objectively reasonable suspicion: (1) Plaintiff's alleged "slow and drifting" driving pattern, (2) Plaintiff's alleged slow speech and demeanor, and (3) Plaintiff's alleged bloodshot eyes. *See* Defendants' Memo. at p. 24.

First, the descriptions of Plaintiff's driving pattern are contradicted by the videotape. Plaintiff's vehicle did not "weave." Also, the only time the GEO crossed—very briefly and slightly—over the center yellow line was as it was attempting to merge into the right lane of traffic in order to pull into the emergency lane. In addition, Trooper Howe's statement that the GEO was "coming up behind him in the left lane" presupposes that the GEO was traveling faster than he was. Furthermore, his statements as to slow speed and "she won't pull over"

ignore the fact that there was steady traffic in the right lane, that the GEO was keeping pace with that traffic, and that it was permissible to make a left turn from Route 89. Finally, regarding any alleged "piling up of traffic," the GEO moved into the right lane at 13:18:52, after which only four vehicles passed in the left lane during the next minute: (1) 12 seconds later, (2) 13 seconds later, (3) 23 seconds later, and (4) 59 seconds later. *See* Videotape.

Second, according to Defendants, Trooper Howe's "observation" of Plaintiff was based on his second approach to the vehicle. Defendants' Memo. at 24. This "observation" consisted of one spoken sentence (elicited by Trooper Howe's comment which was not related to the reason for the initial stop): "My car doesn't go up hill very well."

In sum, based on the totality of the circumstances, further detention was not objectively reasonable.

made ... the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information [was] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."

*Adams v. Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972) (quoting *Beck,* 379 U.S. at 91, 85 S.Ct. at 226); *accord, Jones v. City and County of Denver,* 854 F.2d 1206, 1210 (10th Cir.1988). Furthermore, "[w]hen a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Romero,* 45 F.3d at 1476 (quoting *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)). " 'Even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity.' " *Id.* (quoting *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536 (quoting *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040)). Indeed, "no Fourth Amendment violation accrues simply because an officer failed to delve into the case before him as fully as [a court], viewing the matter at a comfortable remove, might have hoped." *Beard,* 24 F.3d at 117. According to the Tenth Circuit:

> [t]his rule of probable cause has been described as a "practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

*Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Moreover, "[u]nder the 'fellow officer' rule, 'probable cause is to be determined by the courts on the basis of the collective information of the police involved in the arrest, rather than exclusively on the

extent of the knowledge of the particular officer who may actually make the arrest.' " *Id.* (quoting *United States v. Troutman,* 458 F.2d 217, 220 (10th Cir.1972)).

 Based on these standards, Trooper Speigel has met his burden of showing that he had a reasonable belief that probable cause existed for the arrest. *See id.* (noting that in § 1983 action defendant has "burden of going forward with evidence establishing the existence of probable cause"). First, there is no evidence to show that Trooper Speigel did not interview Trooper Howe when he arrived at the scene. Thus, Trooper Speigel could rely on Trooper Howe's observations. More importantly, however, the information which Trooper Speigel garnered during his administration of the roadside sobriety test battery was sufficient "to warrant a prudent man" to conclude that Plaintiff was under the influence. Plaintiff herself concedes that she has coordination and balance problems. She also concedes that people sometimes think that her speech is slow. It is also undisputed that Plaintiff's "internal clock" was off by a wide margin,[16] and that she could only touch the tip of her nose one out of six times. Furthermore, all of these "failures" are objectively captured on videotape.

In sum, based on the totality of the circumstances, the court finds that Trooper Speigel's belief that Plaintiff was impaired was not unreasonable. He is therefore entitled to qualified immunity on this issue.

### 2. Strip Search

Plaintiff also contends that Trooper Speigel's action in ordering the strip search was without legal authority, and that the law in this area was clearly established at the time of the search. Defendants counter that the strip search was constitutionally justified, and that Trooper Speigel is entitled to qualified immunity because his actions were objectively reasonable.

"There can be no doubt that a strip search is an invasion of personal rights of the first

---

**16.** When asked to estimate when 30 seconds had passed, Plaintiff thought that it had passed after only 5 seconds.

magnitude." *Chapman v. Nichols,* 989 F.2d 393, 395 (10th Cir.1993). In discussing such searches, the *Chapman* court quoted the following:

> "It is axiomatic that a strip search represents a serious intrusion upon personal rights.... [One court has] referred to strip searches as 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.' "

*Id.* at 395–96 (quoting *Justice v. City of Peachtree City,* 961 F.2d 188, 192 (11th Cir. 1992) (quoting *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) (citations omitted))). Indeed, this area is so fraught with privacy concerns that The Tenth Circuit does not distinguish between simply forcing a person to disrobe and visual body cavity searches. *Boren v. Deland,* 958 F.2d 987, 988 n. 1 (10th Cir.1992).

In contending that Trooper Spiegel's actions were objectively reasonable, Defendants point to *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and the balancing test established therein. In *Bell,* the Court stressed that:

> [t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884; *accord, Chapman,* 989 F.2d at 395. Applying these factors to the instant case, Defendants have provided the following reasons why the search was reasonable. First, Trooper Spiegel arrested Plaintiff for driving under the influence of marijuana. Second, Williams also suspected that she may have been under the influence. Furthermore, although Trooper Spiegel ordered the strip search, it was within Williams' discretion to refuse to conduct it. Third, because contraband was not found in the GEO or during the external search of Plaintiff, it was reasonable to as-

sume that it was on her person. Fourth, although Williams did not know what Plaintiff had been charged with, if she had known that Plaintiff had been charged with a "drug related crime," Davis County Jail policy would have compelled a strip search. Finally, the search was conducted with minimal intrusion and with regard for Plaintiff's feelings. *See* Memorandum in Opposition to Plaintiff's Second Motion for Partial Summary Judgment and in Support of Defendant's Cross–Motion for Partial Summary Judgment at pp. 7–8 (Sept. 6, 1995).

■ Defendants' arguments are without merit. First, it has been noted that the manner in which a strip search is conducted does little to soften the effect: " '[A] strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience.' " *Boren,* 958 F.2d at 988 n. 1 (quoting *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982)). In addition, *Cottrell v. Kaysville City, Utah* casts doubt on Defendants' other arguments.

In *Cottrell,* the plaintiff had been arrested for driving under the influence of either alcohol or drugs, which she denied. *Cottrell,* 994 F.2d at 731–32. She was later strip searched at the jail, even though no drugs had been found in her vehicle or during an external search. *Id.* at 732. Furthermore, her blood sample analysis later showed no alcohol or drugs. *Id.* at 733. On appeal, the court noted the following regarding the trial court's finding that defendants were entitled to qualified immunity:

> the [trial] court determined it was reasonable for the officers to assume Ms. Cottrell had drugs concealed on her body because none were found on her person, or in her car. Moreover, the court held the search was justified because "the plaintiff was booked into the county jail with the rest of the jail population." Finally, the court intimated that the search was reasonable because it is the policy of the Davis County jail to strip search every inmate booked on a drug related charge. These conclusions are unsupportable, both on this factual record and pursuant to the applicable law.

*Id.* at 734 (internal citations omitted). The court went on to question the purpose of the

search in light of the possibility of finding drugs, pointing out that plaintiff: (1) was wearing light summer clothing, (2) had already been through a "thorough pat down search," and (3) had not been out of the officers' sight. *Id.* at 735. This court notes that an identical situation exists here.

In addition, the *Cottrell* court stressed that there was "nothing in the record to indicate [plaintiff] was ever placed in the general jail population." *Id.* Discussing such placement, the court stated that:

> [c]ourts have consistently recognized a distinction between detainees awaiting bail and those entering the jail population when evaluating the necessity of a strip search under constitutional standards. We agree that the security concerns inherent in a bail situation are very different from those present when the detainee will enter the jail for a greater length of time.

*Id.* (internal citations omitted). This court also notes that it is undisputed that Foote never entered the general jail population.

Even more persuasive, however, is a recent opinion dealing with strip searches. *See Warner v. Grand County,* 57 F.3d 962 (10th Cir.1995). In *Warner,* a plaintiff who had been arrested for possessing marijuana was strip searched, even though she was never placed in the general jail population. *Id.* at 963. The woman brought a § 1983 action, and the trial court later granted summary judgment to defendants. *Id.* On appeal, the court made the following observations regarding strip searches and clearly established law:

> [in 1984] it was clearly established in this circuit that a brief intermingling with the general jail population does not justify a strip search absent reasonable suspicion of drugs or contraband. *Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir.1984). It was also clearly established that a strip search is justified if the suspect is to be "placed in the general jail population and has been charged with a drug offense such as *possession* of marijuana." *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1434 (10th Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). On one end of the spectrum, *Hill* instructs that

brief intermingling with the general jail population is insufficient to support a strip search; on the other end, *Lusby* holds that a drug offense charge plus intermingling is sufficient.

*Warner,* 57 F.3d at 964 (emphasis added). Recognizing that the facts of its case fell "somewhere in the middle of this continuum," the court then held that it was not clearly established in January of 1991 that "a strip search following an arrest for *possession* of marijuana, a misdemeanor for which there was no risk that the suspects would be intermingled with the general jail population, was unconstitutional." *Id.* (emphasis added).

In the court's opinion, *Warner*'s analysis regarding strip searches is dispositive of this issue. *Warner* makes clear that the two critical factors involved here are *possession* of drugs and intermingling with the general jail population. It is undisputed that absolutely no drug paraphernalia or drugs were found on Plaintiff, on her passenger, or in the GEO. Furthermore, it is undisputed that she was never intermingled with the general jail population. *A fortiori,* Trooper Spiegel's actions in ordering the strip search were unreasonable. Accordingly, consistent with *Warner,* and pursuant to a balancing of the *Bell* factors, this court finds that the strip search ordered by Trooper Spiegel violated Plaintiff's constitutional rights.

## C. Vehicle Search

Defendants also contend that the search of Plaintiff's vehicle was not a constitutional violation. Plaintiff, in turn, concedes that " 'when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.' " Plaintiff's SJ Response at p. 25 (quoting *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981)). Despite this, she contends that: (1) this was not a lawful arrest, and (2) even if the passenger compartment could be searched, there was no probable cause to search the rear area of the GEO. *Id.* at pp. 25–26.

**1478**

Regarding Plaintiff's first argument, the court has previously found that Trooper Spiegel had probable cause to arrest Plaintiff. The search of the GEO was therefore incident to a "lawful custodial arrest."

■ Plaintiff's second argument is likewise rejected. It is true that *Belton*'s holding is restricted to the "passenger" compartment of a vehicle and to all objects and containers—as well as their contents—located therein. *See Belton,* 453 U.S. at 460–61, 101 S.Ct. at 2864. Plaintiff's argument must, however, be viewed in light of *Belton*'s rationale: "that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].'" *Id.* (quoting *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)). "[T]he justification for [such] search is not that the arrestee has no privacy interest in [such objects and containers], but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *Id.* 453 U.S. at 461, 101 S.Ct. at 2864.

The GEO's rear area is not, within the usual meaning of the term, a vehicle "trunk." A trunk is not easily accessible to the occupants of a vehicle, whereas the hatchback area of the GEO was "generally" accessible. Consequently, this area must logically be viewed as "within the passenger compartment" of the vehicle. Thus, the search of that area and as well as any objects located therein was reasonable.

### D. Conspiracy Claims

■ Although a conspiracy claim is not part of Plaintiff's Amended Complaint, she nevertheless has alleged a general conspiracy. *See* Amended Complaint at ¶ 39. This allegation is unwarranted. In order to state a claim for conspiracy, a plaintiff "must allege specific facts showing agreement and concerted action among defendants." *Durre v. Dempsey,* 869 F.2d 543, 545 (10th Cir. 1989). In this case, however, Plaintiff has made only conclusory allegations which are not supported by specific facts showing the

requisite agreement and concerted action. The court therefore finds that Plaintiff has failed to meet her burden as to this issue.

### E. Trooper McPherson

Defendants also contend that Trooper McPherson is entitled to qualified immunity because: (1) he was not present during the original stop, (2) he was not present during the DUI investigation, and (3) he did not participate in the decision to arrest Plaintiff. Defendants' Memo. at p. 38. Even Plaintiff concedes that "[t]he only real question is whether or not [Trooper] McPherson, who came into this case rather late, had any inkling of the illegal conduct and the stupidity of his associates.... If he did not, perhaps he can be excused." Plaintiff's SJ Response at p. 27.

■ Under the applicable law and the undisputed facts, Trooper McPherson is entitled to qualified immunity. "In order to be liable pursuant to § 1983, a defendant must have personally participated in the alleged deprivation." *Durre,* 869 F.2d at 548 (citing *Meade v. Grubbs,* 841 F.2d 1512, 1527–28 (10th Cir.1988)). Trooper McPherson arrived at the scene after the stop, after the field sobriety tests had been administered, and after the arrest. His sole involvement consisted of assisting in the search of the GEO and arranging for transportation. The court has found that the search was reasonable. Therefore, Trooper McPherson's actions in conducting the search were likewise reasonable.

### F. Trooper Graviet

Finally, Defendants dispute Plaintiff's claim that Trooper Graviet is liable as a supervisor. In asserting this claim, Plaintiff alleges that Trooper Graviet is liable for: (1) deliberately inadequate training and supervision, (2) encouraging troopers under his command to use drug recognition procedures which they did not understand, and (3) encouraging those under his command to stop, detain, and search without reasonable articulable suspicion or probable cause. Although Defendants deny that these claims have a factual basis, Plaintiff counters that the facts

show Trooper Graviet's deliberate indifference.

■ "'[L]iability under § 1983 must be predicated upon a "deliberate" deprivation of constitutional rights by the defendant,' and not on negligence." *Jojola v. Chavez,* 55 F.3d 488, 490 (10th Cir.1995) (quoting *City of Worland,* 977 F.2d at 1399). "'A supervisor is not liable under section 1983 unless an "affirmative link" exists between the [constitutional] deprivation and either the supervisor's "personal participation, his exercise of control or direction, or his failure to supervise."'" *Meade,* 841 F.2d at 1527 (citations omitted). More recently, the Tenth Circuit has instructed that a plaintiff must allege and prove that "defendants actually knew and acquiesced in [the employee's] behavior." *Jojola,* 55 F.3d at 490; *accord, City of Worland,* 977 F.2d at 1400 (noting that imposition of supervisory liability "requires 'allegations of personal direction or of actual knowledge and acquiescence'") (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990)).

■ Based on the evidence and arguments presented, Trooper Graviet is entitled to summary judgment on this issue. Although Plaintiff has provided the court with excerpts from Trooper Graviet's deposition, she has failed to point to specific passages or facts which show that Trooper Graviet "actually knew and acquiesced" in Trooper Howe's alleged illegal actions. Indeed, a careful reading of this deposition by the court has likewise failed to uncover any alleged "knowledge." Nor has Plaintiff provided specific evidence from other sources.

In reality, Plaintiff's argument appears to be that Trooper Graviet had constructive knowledge of alleged illegal activities. However, "'[i]mputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was "so widespread or flagrant that in the proper exercise of its *official* responsibilities the *governing* body should have known of [i]t."'" *Jojola,* 55 F.3d at 491 (quoting *Thelma D. ex rel. Delores A. v. Board of Educ.,* 934 F.2d 929, 933 (8th Cir.1991) (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir.1987), *cert.*

*denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988))).

Plaintiff alleges that Trooper Graviet neglects training and encourages quotas. However, she provides no specific evidence of this. In contrast, it is undisputed that Trooper Graviet held meetings one to four times per month at which policy issues, code issues, and problems were discussed. Graviet Depo. at pp. 6–7. Nor has Plaintiff disputed that Trooper Graviet passes out written legal updates and discusses them with the troopers that he supervises. *Id.* at pp. 62–63.

Plaintiff also contends that Trooper Graviet encourages and ignores misbehavior by his troopers. However, the cited pages in Trooper Graviet's deposition which allegedly illustrate this fail to do so. Instead, the undisputed evidence shows that Trooper Graviet has given instructions forbidding pretext stops. *Id.* at pp. 59–60. Trooper Graviet has also indicated that if a trooper were to tell him that he acted on a "hunch," that trooper is "done." *Id.* at p. 43. In fact, Trooper Graviet has specifically stated that he would not allow an officer to stop a "long blond haired guy [solely] to ask him if he had been smoking marijuana." *Id.* at p. 65.

In sum, it is the court's opinion that Plaintiff has failed to identify specific facts showing that Trooper Graviet either knew and acquiesced in alleged misdeeds, provided deliberately inadequate training or supervision, or that misconduct was so widespread that he should have known of it.

## V. *ORDER*

For the foregoing reasons, and good cause appearing, summary judgment is granted and denied as set forth in this Memorandum Decision and Order.